Meyer M. Mandel and Perle R. Mandel v. Commissioner.
Mandel v. Commissioner
Docket No. 64050.
United States Tax Court
T.C. Memo 1959-168; 1959 Tax Ct. Memo LEXIS 77; 18 T.C.M. (CCH) 730; T.C.M. (RIA) 59168; August 28, 1959
*77 Lawrence P. D'Antonio, Esq., for the petitioners. Donald Chehock, Esq., and Eugene F. Reardon, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax and additions to tax as follows: Additions to Tax, I.R.C. 1939
Sec. 294
Sec. 294
Year
Kind of Tax
Deficiency
Sec. 293(b)
(d)(1)(A)
(d)(2)
1946
Income
$3,129.35
$1,564.68
$281.63
$187.76
1947
Income
3,104.60
1,552.30
280.01
186.68
1948
Income
1,404.66
702.33
132.01
88.01
1949
Income
2,693.78
1,346.89
238.72
157.90
1950
Income
1,119.36
559.68
0
88.82
1951
Income
2,058.42
1,029.21
0
123.39
In controversy are whether petitioner Meyer M. Mandel had unreported receipts from his profession as a physician, whether a part of the deficiencies for each of the years is due to fraud, and whether the years in question are barred by limitations. Findings of Fact During the years 1946 to 1951, inclusive, petitioners were husband and wife and resided in Tucson, Arizona. Their income tax returns for the years 1946, 1947, 1948, 1950 and 1951, and an unsigned Form 1040 for the year 1949, were filed within the time required by law with the then collector of internal revenue for the district of Arizona. No declarations of estimated tax *78 were filed by them for the years 1946, 1947 and 1948. In declarations of estimated tax filed by them for the years 1949, 1950, and 1951 they reported as estimated tax $62.10 for 1949, $62.10 for 1950, and $400 for 1951. The 1949 declaration was filed on January 10, 1950, and the estimated tax of $62.10 was paid on that date. Meyer M. Mandel (hereinafter sometimes referred to as petitioner) has been licensed as a physician since 1938 and commenced the practice of medicine in Wilcox, Arizona, in July of 1938. At that time he had no assets. He continued his practice in Wilcox until 1941, when he moved to Tucson, Arizona. During the period he was in Wilcox he earned net income of $4,000 to $5,000 per year. In December of 1941 he enlisted in the United States Air Force and joined his military unit in Long Beach. California, in May of 1942. He served as a Flight Surgeon in the Air Force until late in 1945. Petitioner married Perle Mandel (hereinafter sometimes referred to as Perle) in November of 1943. She had a daughter by a prior marriage who at that time was eight years old. When petitioner concluded his practice in Wilcox, he had a fully equipped office, which included X-ray and other *79 equipment, all of which was stored before he went into the Army. The cost of this equipment was about $8,000 to $10,000. During the early part of his military service petitioner received $200 to $300 per month, which included base pay and allowances. This was later increased to $400- $500 per month. While in the service he sent money to his mother for her use prior to his marriage, and after his marriage he sent money to Perle. Upon the termination of his military service, petitioner removed his equipment from storage and resumed the general practice of medicine in Tucson in the early part of 1946. In the returns filed by petitioner for the years 1946 to 1952, inclusive, the gross receipts from his profession, and net income, were reported to be as follows: Year
Gross Receipts
Net Income
1946
$ 7,277.00
$1,248.69
1947
9,877.00
1,534.85
1948
10,124.61
2,774.12
1949 *
10,880.00
2,963.52
1950
14,611.00
5,431.15
1951
15,010.00
4,951.50
1952
23,448.48
8,361.92
Prior to 1952 petitioner kept his own books. David Kramer, a Tucson, Arizona, accountant, kept his books in 1952. Petitioner prepared the returns for the years 1946, 1947 and 1948. Kramer prepared the returns for the years *80 1949 through 1952; they were based upon a daily record of receipts and expenditures kept by petitioner in a book known as a "Physician's Log". On September 15, 1952, Perle commenced a suit for separate maintenance against petitioner in the Superior Court of Pima County, State of Arizona (hereinafter sometimes referred to as the Arizona Court). He counterclaimed for divorce. In the complaint filed by Perle she alleged that petitioner's annual earnings had amounted to $34,000. In December 1952 Kramer testified in that proceeding as to the gross income shown in the returns filed by petitioner for the years 1949 to 1952, inclusive, which he had prepared. Petitioner heard that Perle had reported him to the Internal Revenue Service and that he was being investigated, and he "got kind of leery". He feared that if the Internal Revenue Service found discrepancies of any sort after Perle received her share of the community property he "would be stuck with any deficiencies". Early in 1953, he visited Kramer's office and asked Kramer to compute revised tax liabilities for the years 1946 through 1951, using amounts for gross receipts for each of these years which he (petitioner) had written on *81 a sheet of paper. Petitioner told Kramer that these amounts were true and correct. They were larger than those reported in the original returns. Kramer did not want to make out amended returns but he finally agreed to prepare, and prepared, amended returns in pencil for the years 1946 through 1951. These returns differed from the original returns only in that they showed the larger amounts of gross receipts and correspondingly larger amounts of net income. The amounts reported as deductions on the original returns were used in the pencilled amended returns prepared by Kramer. In May, 1953, petitioner went to Phoenix, Arizona, about 125 miles from Tucson, and employed James W. Coombs, a Phoenix accountant, to prepare complete amended income tax returns for the years 1946 through 1952. Petitioner gave Coombs the pencilled drafts of amended returns prepared by Kramer and also copies of the original returns for those years. He did not give Coombs any of his books and records. Coombs compared the Kramer pencilled returns with the original returns and attempted through a net worth computation to verify the income shown on the Kramer returns. He received some of the data used by him in making *82 this computation from petitioner. He put the net worth computation in his file. He used figures in pencil on the Kramer returns, with some minor changes, in preparing complete amended returns for the years 1946 through 1952. The amended returns prepared by Coombs showed an additional tax due for each of these years. Coombs prepared the usual number of copies of the amended return for each year, namely, an original for filing, a copy for petitioner, and a copy for Coombs' office files, and the transmittal letter to the District Director. He also prepared for petitioner two schedules (hereinafter sometimes referred to as the schedules) setting forth additional Federal and Arizona state income tax liability of petitioners for the years 1946 to 1952, inclusive. The portions of the schedules relating to Federal income tax liability are as follows: Schedule 1
Summary of Additional Taxes, Interest to 9/30/53
and Possible Penalties - Years 1946-1952
Additional
Interest to
Year
Tax
Tax Paid
Tax Due
9/30/53
Penalties
Total
Liability
1946
$ 3,129.35
$ 3,129.35
$1,228.27
$2,065.37 [n1]
$ 6,422.99
1947
3,111.25
$ 6.65
3,104.60
1,032.28
2,049.04 [n1]
6,185.92
1948
1,466.76
62.10
1,404.66
382.77
927.08 [n1]
2,714.51
1949
2,693.78
2,693.78
572.43
1,508.52 [n2]
4,774.73
1950
1,542.38
423.02
1,119.36
170.70
626.84 [n2]
1,916.90
1951
2,456.52
398.10
2,058.42
190.40
1,152.72 [n2]
3,401.54
1952
1,427.99
1,281.61
146.38
4.76
45.38 [n3]
196.52
Total
$15,828.03
$2,171.48
$13,656.55
$3,581.61
$8,374.95
$25,613.11
[n1] *83 Fraud Penalty 50%; Failure to file estimate 10% and Underestimate 6% - 66% [n2] Fraud Penalty 50% and Underestimate 6% - 56% [n3] Delinquent Penalty 25% and Underestimate 6% - 31% * * *
Schedule 2
Payments to be made when filing Amended Returns
Director of Internal Revenue (Federal)
Interest to
Year
Tax
9/30/53 *
Total
1946
$ 3,129.35
$1,228.27
$ 4,357.62
1947
3,104.60
1,032.28
4,136.88
1948
1,404.66
382.77
1,787.43
1949
2,693.78
572.43
3,266.21
1950
1,119.36
170.70
1,290.06
1951
2,058.42
190.40
2,248.82
1952
146.38
4.76
151.14
Total
$13,656.55
$3,581.61
$17,238.16
The so-called penalties were included in Schedule 1 by Coombs for the purpose of showing the maximum possible liability. The amounts of gross receipts shown on the returns filed by petitioners, the additions made to those receipts upon which the "Additional Tax Due" shown on Schedule 1 was based, and the total revised receipts, for each of the years 1946 through 1951, were as follows: Receipts per
Addition to
Total revised
Year
returns
receipts
receipts
1946
$ 7,277.00
$11,981.49
$19,258.49
1947
9,877.00
11,636.20
21,513.20
1948
10,124.61
7,749.80
17,874.41
1949
10,880.00
13,325.02
24,205.02
1950
14,611.00
5,761.47
20,372.47
1951
15,010.00
8,805.98
23,815.98
*84 After completing his work on the amended returns and schedules, Coombs delivered them to petitioner and his attorney on September 20, 1953. At that time they "borrowed" Coombs' file containing his work sheets, his copies of the amended returns and the schedules, and his net worth computation. This file was never returned to Coombs. Petitioner paid Coombs a fee of $800 for his services. On September 23, 1953, at a pre-trial conference, attorneys for petitioner presented the foregoing schedules to the Judge of the Arizona Court and stated that they anticipated there would be a tax liability for the years 1946 through 1952, and that they were fearful, if there was a distribution of the community assets, that Perle would disappear and the Government would seek to collect the liability entirely from petitioner's separate property. They asked the court to order that a portion of the community property be sold and that the money from the sale be impounded to pay delinquent taxes and held until there was a determination of the liability to the United States for such taxes. The court complied with their request, ordered a sale of community real estate, and impounded approximately $20,000 realized *85 on the sale for the purpose of meeting the anticipated additional tax liability. This fund is still impounded by the Arizona Court, and is intact except for some fees that have been allowed against it. Since receipt of the schedules by the Arizona Court and the impounding of the fund, there has been no further communication to the court respecting the petitioners' income tax liability for the years mentioned in the schedules. There was no clerk or reporter present at the pre-trial conference and the schedules were not stamped and marked as an exhibit. They were placed in the file kept by the Arizona Court in the case of Perle Mandel v. Meyer Mandel, by Judge Robert S. Tullar, who presided over the proceedings in that case, and he notified the United States District Judge for the District of Arizona that there was a record in his court that indicated a failure to pay income taxes over a period of years. The District Judge thanked him for the information and told him that he would pass it on to the appropriate Federal authorities. On September 25, 1953, Perle was arrested and a criminal complaint was filed against her charging her with a conspiracy to murder and attempt to murder her *86 husband. When this occurred petitioner ceased to be concerned about any additional income tax liability. He did not file the amended returns prepared by Coombs. Sometime in the latter part of 1953 he destroyed the entire file "borrowed" from Coombs and the amended returns Coombs had prepared. On January 4, 1954, Perle was convicted of attempt to murder petitioner and sentenced to 2 1/2 to 4 years in the State Prison of Arizona. In January 1954 the returns of petitioners for the years 1946 to 1952, inclusive, were assigned to Jack O. Williams, an agent of the Internal Revenue Service, for investigation. He informed petitioner of this assignment and asked petitioner to make available his records, including his cancelled checks and bank statements. Petitioner produced his physician's log for the years 1951 and 1952 and told the agent that his daily logs for the preceding years had been stolen. He also stated that he was looking into the possibility of filing amended returns, and that his cancelled checks and bank statements were in the possession of his accountant for that purpose. When asked why amended returns were necessary, he told the agent he would prefer to defer answering that *87 question until such time as the accounting work had been completed, and that he would then give the agent the amended returns showing exactly what changes had been made. The agent also questioned petitioner as to his assets and liabilities at the beginning and end of the period under investigation. Petitioner told the agent that when he was discharged from the Army and returned to Tucson early in 1946, he had no assets of any consequence other than a small amount of cash ranging from $1,000 to $2,000. In March of 1955 the agent phoned petitioner and asked him why he had not prepared the amended returns and presented the returns and his records for examination. Petitioner assured the agent that the work was continuing, that it would be done shortly, and that at that time he would make all of those documents available for the agent's examination. At that time petitioner told the agent David Kramer was preparing the amended returns. The amended returns and cancelled checks were never made available to the agent. After several requests for petitioner's books and records and cancelled checks, and for the amended returns, did not result in their receipt, the agent conducted an investigation *88 to determine the increase in the net worth of petitioner during the period January 1, 1946 to December 31, 1951. A net worth computation made by him after this investigation was concluded indicated that petitioner had a substantial amount of unreported net income during the years 1946 through 1951. Respondent mailed a notice of deficiencies to petitioners on June 4, 1956. Therein, after listing the deficiencies in income tax, and additions to tax, the notice read, in part, as follows: "This determination of your income tax liability has been made upon the basis of information on file with the Internal Revenue Service. * * *
"In the absence of adequate records, your taxable net income has been computed by reference to information filed in the Superior Court of the State of Arizona, in and for the County of Pima, Case No. 38843, Perle Mandel, Plaintiff v. Meyer Mandel, Defendant." The cash on hand, and United States bonds, of petitioners as of January 1, 1946, was not in excess of $12,700. [1] The only other assets owned by them on that date consisted of petitioner's office and medical equipment which was then in storage. During the years 1946 to 1951, inclusive, they acquired the following: *89 Year
Cost
1947
Fluoroscope
$ 850.00
1947
Basal machine
303.00
1949
Office furniture
683.00
1949
Cooler
170.00
1949
Typewriter
66.02
1951
Equipment
1,093.60 As of December 31, 1951, petitioners owned more office and medical equipment than they owned on January 1, 1946. Petitioners had cash on hand in banks of at least $1,000 at the end of 1951. On December 31, 1951, petitioners owned land and an office building at 909 E. Speedway, in Tucson, which they acquired at a cost of $20,100. Such property was subject to a mortgage in the amount of $4,482 as of December 31, 1951. On December 31, 1951, petitioners owned land and a residence at 2925 E. Waverly, in Tucson, which they acquired at a cost of $19,500. This property was subject to a mortgage of $6,500. On December 31, 1951, petitioners owned land and a residence at 3330 Via Golondrina, in Tucson, which they acquired at a cost of $28,742.21, subject to a mortgage in the amount of $15,000. On December 31, 1951, petitioners had an outstanding liability in the amount of $4,750 owed D. E. Bartz on notes payable. *90 During the years 1946 to 1951, inclusive, the total amount of Federal income taxes paid by petitioners was $889.87. During 1952 petitioners expended $2,318.62 for premiums on life insurance policies and $625.13 for premiums on health and accident policies. They had 15 insurance policies. Some of these policies were held by them during the years 1946 to 1951, inclusive. On one of these policies, a $10,000 National Service Life Insurance policy, petitioner paid a premium of approximately $60 semi-annually. Petitioners allowed all of their insurance policies, except the National Service Life Insurance Policy, to lapse in 1953 and received cash surrender values of approximately $5,000. Petitioner did not own an automobile as of January 1, 1946. During each of the years 1946 through 1951 he owned an automobile which he used in his business. In 1946 he owned a 1942 Chevrolet which was purchased in 1946 for $1,300. In 1947, 1948, 1949 and 1950 he owned a Chrysler which was purchased in 1947 for $2,245. The Chrysler was sold in 1951. In October 1950 he purchased an Oldsmobile for $3,253.36, and this automobile was owned by him on December 31, 1951. On the latter date he also owned a Plymouth *91 automobile which was purchased for Perle in 1951, when they moved into the Via Golondrina residence. The expenses of maintaining his household were paid by petitioner during the years 1946 through 1951. During 1946 and 1947, his family consisted of himself and Perle, and her daughter by a former marriage. In 1948, his family was increased by the birth of a son, Howard Gordon Mandel, and in 1949 by the birth of another son, Bradley J. Mandel. During each of the years 1946 through 1951 he gave Perle a weekly allowance for food, and in addition paid for clothing for his family, the utility bills, and the principal payments on the three mortgages. Prior to 1951 he employed a part-time cleaning woman. In 1951 he employed a maid whom he paid $15 a week, and during that year he also paid the cost of operating the automobile purchased for Perle. Petitioners had a substantial amount of unreported income during each of the years 1946 to 1951, inclusive. The returns of petitioners for the years 1946, 1947, 1948, 1950 and 1951 were false and fraudulent with intent to evade tax and part of the deficiency for each of the years 1946 to 1951, inclusive, was due to fraud with intent to evade tax. Opinion *92 RAUM, Judge: The statute of limitations issue must be decided against petitioners if fraud is established, [2] and we are satisfied in this respect that the Government has carried its burden of proof. We need not detail the evidence. It is plain upon the entire record that petitioner received income substantially in excess of what he reported, although possibly not as much as the $34,000 a year charged by his wife in the divorce proceedings. He was concerned that an investigation of his affairs would reveal a significant gap between reported income and his actual income, and he or his attorneys persuaded the judge in the divorce proceedings to set aside approximately $20,000 out of the community assets to meet the anticipated liability. He even paid an accountant $800 to prepare amended returns, which, after his wife's attempt to murder him, he decided not to file. He falsely told the Government agent in 1954 and 1955 that amended returns were then being prepared for him and used that circumstance as an excuse for not turning over checks and other records to the agent. Such returns had in fact already been prepared in September 1953 and were thereafter destroyed by petitioner in 1953. *93 It is clear to us that fraud was present in connection with each of the years in controversy, and that part of the deficiency was due to fraud. Although the burden of proving fraud was upon the Government, the burden in relation to the basic tax liability was upon the petitioners. They have not shown the Commissioner's determination to be in error. Indeed, virtually no evidence of any consequence was presented to show that the basic tax liability was less than that determined by the Commissioner. Instead, petitioners' counsel has made an extended attack upon the two schedules used by the Commissioner in making his determination. The deficiency notice states that "In the absence of adequate records, your taxable net income has been computed by reference to information filed in the *94 Superior Court of the State of Arizona * * *." (Italics supplied.) But, says petitioners' counsel, the schedules in question were not "filed". This is a mere quibble. The fact is that the schedules were presented to the Arizona judge by petitioners' representative at a pretrial conference, at which no reporter was present, and that they were presented to him for the purpose of showing that there was an anticipated tax liability so that he would require the sequestration of certain property in order to meet that liability. Further, the funds in question are still impounded for that purpose. It is a matter of no consequence whatever that the schedules were technically not stamped "filed" by the Arizona Court, nor does that circumstance in any way weaken the correctness of the Commissioner's determination. We cannot find that the Commissioner erred in his determination as to the basic deficiencies. And the fraud that we found in connection with the statute of limitations issue is sufficient ground to justify the 50 per cent addition for fraud. Petitioners did not allege any error in the pleadings with respect to respondent's determinations of additions to tax under Section 294(d) for *95 any year that is not barred by the statute of limitations. Respondent determined that petitioners were liable for an addition to tax for the year 1949 under Section 294(d)(1)(A) for failure to file a declaration of estimated tax for that year. The evidence discloses that petitioners did file a declaration of estimated tax for 1949 and paid the amount of $62.10 reported thereon as estimated tax. In the circumstances we hold that petitioners are not liable for any addition to tax for failure to file a declaration of estimated tax for 1949, but are liable for the other additions to tax determined for that year and for the additions to tax determined for the years 1946, 1947, 1948, 1950 and 1951. Decision will be entered under Rule 50. Footnotes
*. The 1949 return was not signed.↩
*. Coombs completed his work in September 1953 and therefore computed interest to September 30, 1953, upon the assumption that the amended returns would be filed by the end of September.↩
1. Included in this amount is $3,000 for United States Series "E" Bonds purchased during 1942 and 1943. The face amount of the bonds purchased was $3,450.↩
2. The year 1949 is open for the further reason that the unsigned return filed for that year does not qualify as a return under Section 51(a), I.R.C. 1939, and therefore did not start the running of the statute of limitations. Cf. Lucas v. Pilliod Lumber Co., 281 U.S. 245, affirming 7 B.T.A. 591; Roy Dixon, 28 T.C. 338, 348; Theodore R. Plunkett, 41 B.T.A. 700, 711, affirmed 118 Fed. (2d) 644↩ (C.A. 1).